### TAYLOR v
### DAYTON BLDG & SAVINGS ASSN et

Ohio Appeals, 2nd Dist, Montgomery Co

No 1494. Decided Sept 22, 1938

Brumbaugh & Brumbaugh, Dayton, and Ralph Skilken, Dayton, for Mary Taylor.

McConnaughey, Demann & McConnaughey, Dayton, for Association.

### OPINION

By GEIGER, J.

While the ultimate question for determination is simple, so many facts are involved and so much evidence has been introduced that our opinion must necessarily be lengthy.

The question is whether or not the plaintiff, Mary Taylor, in her name and in the names of other persons, some real and

some fictitious, was a stockholder or the holder of certificates of deposit in the defendant company at the time it was taken over by the superintendent. In order that the issues may be understood, it will be necessary to state the pleadings as briefly as possible.

The petition asserts, after stating formal parts, that the plaintiff in pursuance of notice given by the superintendent presented a claim against the defendant for preference or priority in the distribution of the assets of the defendant, which claim was rejected by the superintendent for the reason that the accounts are carried on the books of the Dayton Building & Savings Association as paid up and running stock; that her claim is a good and valid claim and that she is entitled to a preference or priority in the sum of $149,818.99.

In her second cause of action plaintiff sets up that in 1922 she made a deposit of $58,000.00, as a savings deposit, and requested the association to issue to her a certificate of deposit in the name of four individuals, Cleota M. Brown, Angie A. Smith, Doris R. Jones and Fidelis Y. Jackson, $15,000 to three and $13,000 to the fourth. She asserts that the money was her sole property and that she requested certificates of deposit in the several names for her own convenience and that contrary to her instructions and without her knowledge, the association caused to be prepared certificates of paid up stock in the several amounts to the parties named.

That in 1929 she made a deposit of $48,000, as a savings deposit, and requested the association to issue to her certificates of deposit in the names of May A. Booth, Clara S. James and Flora M. Staff, each in the sum of $16,000, which money she states was her sole property and that she requested certificates of deposit in the foregoing names for her convenience; that said association accepted the same and contrary to her instructions and without her knowledge, caused to be prepared certificates of paid up stock in the amount and to the persons enumerated.

She further says that on October 17, 1931, she made a deposit of $16,000, as a savings deposit, with the request that the association issue a certificate of deposit in that amount to Ludovia Fries and that on October 29, 1931 she made a deposit of $15,000, as a savings deposit, requesting the association to issue to her a certificate of deposit in the name of Mildred Cook; that said money was her sole property. She requested the deposit to be made in the

several names for her own convenience; that contrary to her instructions and without her knowledge, the defendant caused to be prepared certificates of paid up stock, one in the amount of $16,000 and the other in the amount of $15,000, in the two last mentioned names.

She further says that the association kept all of the above certificates in its possession in its safe and she never had any of said certificates in her possession, nor did she see the same until April, 1932, when she discovered that the association had prepared for her certificates of paid up stock instead of issuing to her certificates of deposit; that she then immediately notified the association that it had made a mistake in the issuance of evidence of indebtedness for the money deposited and that the officers of said association then promised to rectify said error and to enter her deposits as savings deposits, in accordance with her intention and instructions at the time the deposits were made. That from time to time following April, 1932, the officers assured her that said accounts had been corrected to show savings deposit accounts and that in fact said corrections and transfers were made and that it was not until after the superintendent took over said association for liquidation that she learned that the liquidating agent questioned her right to have said deposit accounts considered as such.

She says that she deposited moneys in said association on savings deposit accounts prior to March 29, 1922 and that the officers issued to her certain pass books, which were marked "Savings Deposit Account" and that when amounts accumulated and were entered in other pass books none of the money was given to the association for the purpose of purchasing stock; that she was acquainted with the methods of bookkeeping of the company and relied upon its officers and, at all times, believed that the records showed that the moneys were on deposit and not used for the purchase of stock.

She further asserts that a further sum of $12,818.99 was deposited as a deposit account. She asks that the claim be allowed as a claim based upon a deposit of money evidenced by certificates of deposit and savings account deposits and the record of the association be corrected to conform to the terms with which she deposited the money, to-wit, that of a savings account deposit and certificates of deposit; that the superintendent be ordered to so maintain the certificates of deposit on the books and be ordered to grant to her certificates of de-

posit in accordance with other certificates of deposit which have been granted and that the defendant be required to set aside a fund sufficient to make payments to the plaintiff in like manner as payments are made to other certificate holders.

The defendant, Wagner, as superintendent and as successor to Paul A. Warner, files an answer admitting certain allegations, including that the plaintiff presented her claim, which was rejected. He admits that there were deposits as set forth in the petition in the amount of $149,818.99, but denies that they were issued in the name of Mary Taylor and denies that she is the owner of the certificates and that those in whose name they were issued, other than Mary Taylor, have not made claim for the income or for the stock accounts. Defendant says that on certificates of stock, dividends have been paid in excess of interest on paid up certificates of deposit and that these payments have been made as dividends and received by the plaintiff as such and denies that she is entitled to any preference.

Defendant denies that the officers of the association transferred said accounts on the books of the company or that, in fact, said corrections and transfers were in any manner authorized and denies that the officers had any authority from the party in whose name the stock certificates were issued to make the transfers. The same allegations are made as to other deposits, not in the name of the plaintiff.

The plaintiff replied to the answer of Wagner, making certain admissions and denials, among the allegations being, that she had no knowledge whether the credits were in the nature of dividends or interest, but believed them to be income on certificates of deposit and deposit accounts and that if the amount so credited was, at any time, in excess of the amounts due as interest she had no knowledge of the same and offers to remit the excess.

The association filed an answer admitting the paid up stock certificates were issued as numbered and to the various persons therein named, but denies all other allegations and makes certain statements as to the by-laws of the association controlling the issuing of running stock, paid up stock and certificates of deposit.

To this answer of the association, the plaintiff replies, denying that she at any time accepted paid up stock certificates, as alleged in the answer and she makes further allegations in reference to specific accounts.

## OPINION OF THE COURT BELOW.

The court below found in favor of the defendant and dismissed the petition. The plaintiff moved the court to vacate its findings for the reason that they are not sustained by sufficient evidence and are contrary to the manifest weight of the evidence and for errors of law. A motion for new trial was made and overruled and notice given of an appeal on questions of law and fact.

## THE TESTIMONY.

The transcript of testimony covers about 300 pages and it will be impossible for us to detail the testimony of each witness or here microscopically examine the testimony of any one witness. We must be content with announcing our general impressions, referring counsel to the record for further details.

## MRS. MARY TAYLOR.

Mary Taylor is the claimant in this case and her direct and cross-examination in chief, covers the first 90 pages of the record. Considering that her claim involves nearly $150,000, which she accumulated and deposited from sources not disclosed, during the years between 1911 and 1932, she gives the impression of one who frequently resorts to a lapse of memory, which is scarcely in keeping with one whose intelligence must have been above the ordinary in financial matters. We find frequently repeated such expressions as "I don't know", "I wouldn't know", "I can not remember", "it has been a long time ago" in reference to transactions with which her memory would naturally be charged, inasmuch as they frequently related to rather large sums. One thing she holds firmly in memory and that is, under the instruction of her uncle she had a fixed purpose of avoiding the position of a stockholder, he having told her not to invest in stocks. She seems to have no difficulty in recollecting that in any given transaction called to her attention she had instructed the officers of the bank to make the investment in certificates of deposit, using even the technical term "C. D's" which was not generally used in this locality until it became a matter of financial consequence as to whether one had deposited money in a building and loan association as running stock or as C. D.'s. She also testifies to a rather unusual reliance upon two individuals connected with the association, Miss Carrie D. Thomas and Mr. MacDonald, repeatedly stating that she left all matters of detail to them and

trusted that they carried out her general policy of investing her money in certificates of deposit rather than in running stock. She also had a penchant, apparently unaccounted for, for depositing her money under fictitious names, asserting that she and Miss Thomas got together and made the selection of these fanciful participants in her wealth. In speaking of the selection of names, she said Miss Thomas would select one and I would select another one. They just got together and selected certain names, deposits as high as $16,000 being reposed in the rather striking names of Fidelis Jackson, Dorris Jones, Anzie Smith, Cleota Brown, Mary Booth, Clara James, Flora Staff, Ludovia Fries and Mildred Cook.

One other peculiarity of her testimony is that she designated certain persons as her agents, one her brother-in-law, and there seems to be a rather pronounced tendency to deny a delegation to such agent of any authority which might be to her detriment through some act of the agent. This, however, we are not inclined to weight against her.

She also is frank to admit her signature to certain documents, but at the same time deny any recollection of the document or its signing or any knowledge of its import. These and many other things in reference to her testimony have attracted our attention but, as before stated, we will not weigh them in the scales against her except so far as to say that we are more inclined to give credence to actual transactions, evidenced by books and records, than to her statements as to her intention or the effect of her declarations.

She testified that her visits to the bank during the course of years were infrequent and that all her business was transacted with Miss Thomas and Mr. MacDonald. Many of her directions as to the care of her funds were conveyed by telephone messages, rather than by personal contact. She also testified that she had never had in her possession any of the stock and did not know that it was represented by stock until she was told by Mr. MacDonald in 1932. Several months after her first information, she obtained from the custody of the bank the stock certificates now in question.

An issue had been made in the pleadings that the plaintiff is not the owner of the securities standing in the name of the fictitious persons. We think enough has been developed that unless evidence appears to the contrary, we can now arrive at the conclusion that the entire claim, in the sum of approximately $150,000, belongs to and is the property of the plaintiff, dismissing from further consideration the allegation of the defendant, asserting her lack of ownership or the lack of action upon the part of these stockholders, who have no existence, except as creatures of her own fancy, with such assistance as may have been rendered by Miss Thomas.

Mrs. Taylor testified that she signed the proxies at the request of Mr. MacDonald, because he stated that it would help him keep his job and said that he would help her, if she would do it.

### JAMES J. GIBSON.

The direct and cross-examination of Mr. Gibson, in chief, extends from page 92 to 170 and covers a minute examination of the records of the association which it will be impossible and unprofitable to follow in this opinion. Many questions center around the several exhibits and the interoffice adjustment of the accounts of the plaintiff.

One matter that seems to stand out in the evidence in chief is that in most transactions showing the issue of stock in the name of Mrs. Taylor or her associates, the stock stubs corresponding to the several certificates were not signed by Mrs. Taylor, where it is customary to have stockholders sign a receipt. The evidence discloses that in many other cases of the issuance of stock, at or about the time the certificates were issued to Mrs. Taylor, the stockholders signed the receipt in the stub book. In the case of one of the largest issues of stock for 500 shares, certificate No. 1003 representing $50,000 which came from the cancellation of a paid up stock certificate for 450 shares or $45,000 and from stock account No. 199 and dated April 5, 1921, there is no receipt signed by Mary Taylor on stub or on the certificate. This $50,000 together with $8,000 coming from the running stock account No. 199 was afterwards charged to certificates Nos. 1306, 1307, 1308 and 1309, which now appear to be Exhibit No. 6. These were issued under date of March 29, 1922. The check issued in this transaction was payable to C. D. Thomas, agent, and was endorsed by Carrie D. Thomas and there was no receipt for this amount of stock on the stock book indicating that Carrie D. Thomas, the assistant secretary drew the check for $50,000, payable to herself as agent and endorsed the check and redeposited it with the funds of the association, all of which was a necessary part of the bookkeeping transaction to accom-

plish the cancellation of the 500 shares and the issuing of new certificates.

It would be an endless task to follow all the transactions relating to the issue and re-issue of running stock certificates in the name of Mrs. Taylor and her associates.

Much stress is laid upon the fact that on all the outstanding stock certificates, in the name of Mrs. Taylor and her associates in 1931 in a total of $137,000, there was credited to her running stock account certain sums, which are claimed to indicate a payment on these outstanding certificates in the amount of 5%, whereas when certain of these credits were made there was being paid either less or no dividends on running stock, the inference being drawn that the officers of the company proceeded on the theory that she was entitled to 5%, the rate of interest which was paid on certificates of deposit rather than the fluctuating rate being paid upon running stock. Testimony was given in relation to the meeting of the Board of Directors held on July 14, 1933, in which all members of the board were present, with one exception. The minutes recited that the secretary presented to the board the situation in relation to the running and paid up stock of Mary Taylor and other persons, members of her family, the secretary stating that according to the books these accounts had consisted of running and paid up stock, or both, over a period of many years and that regular dividends had been credited to the same and that at the end of the six months period, closing March 31, 1932, no dividends having been declared, Mrs. Taylor became dissatisfied and claimed that she had not known that she had stock accounts and thought she had savings and certificates of deposit accounts and she insisted that her interest be protected on some basis, as though that had been the case until the matter could be determined in some satisfactory way. The secretary told her he would endeavor to set aside, temporarily, the equivalent of interest on her accounts until such time as the same could be passed upon by the authorities; that Mr. Cole who had been in charge of the affairs of the association had insisted that these accounts represented stockholdings and not certificates of deposit and that the earnings tentatively set aside as a credit as interest in lieu of dividends could not be approved. It was suggested that the board take action to conform to the holdings of the state superintendent in respect to these accounts and the earnings thus provisionally set aside and that said earnings so set apart for the semi-annual periods ending March

31, 1932, September 30, 1932, and March 31, 1933, be carried in the current earnings of the association and upon motion, the suggestion of the secretary was approved.

Nothing was done in reference to this resolution of the directors from the time of the meeting on July 14th until September 23rd, and no disposition was made of the earnings, which had previously been credited to Mary Taylor's certificates.

A long examination of Mr. Gibson does not definitely establish any theory upon which we may determine whether Mrs. Taylor was, as a matter of fact, a stockholder or the owner of certificates. It does clearly establish that during the long course of years, the money deposited by her was carried in accounts of running stock and she was paid dividends rather than interest. It further appears that after she had protested, when dividends were no longer paid, there was credited to her running stock account interest at a fixed rate of 5% and that this action, concerning which we have no minutes, was modified by the July 14th meeting, after the representatives of the state had objected.

## MISS CARRIE D. THOMAS.

The testimony of Miss Thomas covers 22 pages of the record. She was an assistant secretary of the Dayton Association for about 18 years, entering its employ in 1915 and, afterwards in 1918, became assistant secretary. During all of her employment, Allen C. McDonald was secretary and attorney for the association. She herself had charge of counter or teller work. Her employment terminated in June 1933. During her whole course of employment she was acquainted with Mary Taylor. Upon being asked "Do you know what the nature of her investments in the Dayton Association were at the time you went to work" she replied "Certificates of time deposit drawing interest." She recalled very few times that Mrs. Taylor was in the office. She did not see her for the first 5 or 6 years of her employment and there might have been one or two times when Mrs. Taylor personally talked to her. In speaking of her investments, she referred to them as certificates of time deposit, although in this she was not definite. In 1922 or 1923, the policy of the association was changed so that the dividend rate was raised above the interest rate. On October 6, 1920 Mrs. Taylor had a certificate of time deposit of $20,000 and another certificate of $5,000 and a pass book credit on account No. 199 of over $20,000, with which fact Miss

Thomas was acquainted. On that date the certificates of deposit were cancelled and her book was charged with a withdrawal of $20,000, the total sum of $45,000, then appeared in the shape of paid up stock for 450 shares, which transaction was handled by Miss Thomas. Upon being asked why this change was made, her reply was, "Well, I don't believe for any other reason than that the stock dividend was just a little higher than the certificate interest rate, and I think we always endeavored to do as much as we could for Mrs. Taylor, giving her the highest rate possible and I presume that is the reason we gave her the stock rate, 6 1-5%." Being inquired of as to whether she informed Mrs. Taylor as to the change, she answered, "Well, I don't suppose I did on account of the rush of work." As to whether she told Mary Taylor that she had changed her accounts, she states, "No, I don't believe I told her. I am pretty sure I didn't." Mrs. Taylor was not there to receipt for the paid up certificates and her signature does not appear on the stub. Her certificates were kept at the bank and she does not remember that she ever had possession of them. If Miss Thomas issued a certificate she put it with the rest of Mrs. Taylor's certificates in the bank vault and as to Exhibit 13, she probably took it into the vault and put it with the rest of her certificates. As to Exhibit 24, for the 500 shares, dated April 5, 1921, she had nothing to do with it. Later this certificate of 500 shares was divided into three or four or five certificates, and the large certificate was surrendered. The transaction was conducted by Miss Thomas. She issued the four certificates, Lxhibit 6, 6a, 6b and 6c, on the 29th day of March, 1922. She has no distinct recollection of the $58,000 transaction represented by the exhibits. She does not think Mrs. Taylor was there when certificates were issued and she did not tell her that she had issued them. She issued the check for the $8,000 and for the $50,000, payable to Miss Thomas and endorsed by her. The receipt on the stub was not signed. Mrs. Taylor had no part in the mechanics of the re-issue of stock and she evidently was not present. Being asked as to the source of her authority for issuing the four certificates in fictitious names, she stated that it could only have come from Mr. McDonald or Mrs. Taylor. She did not tell Mrs. Taylor that she had issued stock instead of certificates. Miss Thomas made out the subscription card for running stock on October 2, 1924, which was not signed by Mrs. Taylor or anyone for her.

The subscription card, Exhibit 11, looks like Mrs. Taylor's handwriting. The body of the card is in Mr. McDonald's writing. On being inquired of as to Exhibit 2, pass book No. 12524, showing withdrawal of $48,000, she stated that there was on deposit $57,000, plus. Running stock was charged with the $48,000 and a debit ticket for that amount was made by Miss Thomas, for which Mrs. Taylor was to get certificates of deposit, there appearing on said card "3 new C. D.'s", written by Miss Thomas. If Mrs. Taylor had asked for running stock, the notation would probably have been P. U. S. The usual designation was "Certificates". C. D.'s meant certificates of deposit and P.U.S. meant paid up stock. Mrs. Taylor asked for certificates of time deposit when she had this credit. The certificates of running stock, Nos. 4185, 4186 and 4187, are in Miss Thomas' handwriting, dated April 1, 1929 and were the instruments issued to Mrs. Taylor following the request from the debit card of April 1st for "3 new C.D.'s."

After the certificates were made up, they were put back into the safe, witness stating that she did not believe Mrs. Taylor had possession of them. When Mrs. Taylor did not receive her interest check, she came in and had words with Mr. McDonald, demanded her certificates and took them away with her. After Mrs. Taylor objected when she did not receive her interest, some credits were made on her passbook just to pacify her "which probably was not legal, but it was done."

$16,000 was withdrawn on October 1, 1931 and stock certificates issued for that amount. On October 29, 1931, $15,000 was withdrawn which would correspond to a certificate for 150 shares, signed by Mr. McDonald.

On cross examination, Miss Thomas stated that Mrs. Taylor did not come to the office often, not more than three or four times in 8 years. She knew who she was, but did not have anything to do with her every time she came to the office. Not many transactions with her. She did not come in to make weekly deposits. Usually sent somebody upon whom Miss Thomas waited, usually her brother-in-law brought in the pass book which was in her possession. During the early part of the time Mrs. Taylor had her accounts at the association, she had certificates of deposit. From the time of the issuance of the stock to Mrs. Taylor, the dividend rate was higher than the interest rate and remained so. The witness' memory is bad as to any conversations had with Mrs. Taylor at the time of the issuing

of the paid up stock. As to the keeping of the certificates at the bank, it was through an understanding with Mrs. Taylor. The certificates were available, but Mrs. Taylor did not call for them until April 1932. The transaction involving the cancellation of a $45,000 certificate and the issuing of a new certificate for $50,000 was not recalled by Miss Thomas. As to the transaction of March, 1932, when the account was put in four different names, Mr. McDonald asked her to do it. As the reason why the additional $8,000 was taken off the pass book in addition to the $50,000, it was because some members of Mrs. Taylor's family were anxious to know her business, which is also the reason why the certificates were kept at the bank. She does not remember that she suggested the fictitious names, but remembers the discussion aroused by them. She does not recall whether Mrs. Taylor was present or that she consulted with her over the phone or whether she followed Mr. McDonald's directions. She has no recollection why she drew the $50,000 check, payable to herself. McDonald knew that certificates of deposit were being issued at the time and knew what kind of certificates were issued. When one account was closed, it was usual to get a new signature card for the new account. If the bank opened a new account, "we were supposed to get a new signature on that card." She stated that people would sometimes ask the difference between paid up stock and certificates, to which she answered, there is no difference so far as the liability is concerned, the association is in good standing, the stock will be paid just the same as certificates. She did not think that anybody ever realized that there would be any difference. For certificates of deposit, she would say "C. D.'s" for paid up stock, "P.U.S." and for running stock, "R. S." That is the way we referred to them generally. She does not recall any conversation with Mrs. Taylor in reference to three new additional accounts established in the name of Mary Booth, Clara James and Flora Staff, totaling $48,000. She does not remember whether Mrs. Taylor was at the office when the new certificates were issued to Fidelis Jackson and others. She might have talked to Mrs. Taylor. The interest rate on certificates of deposit was, at times, as high as 6% and when the dividend rate was raised to 6 1-5% there were still time certificates bearing interest at the rate of 6%.

Mr. McDonald could have seen the paid up stock certificates which were in the vault, as he was general manager and everything was available to him. As to whether she took her instructions from Mrs. Taylor or McDonald, she answered in substance, I may have taken a lot for granted and gone ahead and done things. Since that time I have probably felt guilty about doing things like that in the light of later things. I just did them and she may have told me or he may have told me or not. "I just went ahead and did that never thinking anything would happen." "It might be one thing, and it might be another thing. I don't know. We just established a precedent and then followed it. I don't know."

MRS. MARY TAYLOR recalled gave as the reason why she carried the accounts in the name of fictitious persons to be because she had inquisitive relatives, one of whom wanted to know all her business. Just had it made up between Miss Thomas and myself. "I said I think it would be the better thing to do." She talked to Miss Thomas and Miss Thomas suggested names. The arrangements were sometimes made by telephone. She never went to the office very much.

In reference to the names of the fictitious persons, she stated, they were all names that we discussed and laughed about. She did not know where the discussion took place. In connection with the fictitious names, each time, after 1922, that she had any money transferred from running stock account to certificates, she would have it put in the name of some other person. She stated, "Yes, sir, I always had it—I had so much on the book and then I always had it put in certificates." She did not think she ever had a running stock account. The account in which she made weekly deposits was in the name of someone other than herself, at her request, made either to Mr. McDonald or Miss Thomas. She requested that the certificates be kept at the association and never requested that they be delivered to her nor did she ask for them.

Plaintiff rests.

\* \* \*

JAMES J. GIBSON, called as witness for defense.

Mrs. Taylor's account was opened with the association April 2, 1911. At the time running stock account No. 199 in her name was opened she had issued to her a certificate of deposit on the same date, which is plaintiff's Exhibit 18, in the amount of $4500. It was outstanding until 1912 and was cancelled and the proceeds used for a new certificate, No. 797 (Exhibit 19) for

$6000 dated October 4th, partially paid for by the former certificate of deposit. A part of the funds came out of running stock account No. 199.

Further testimony as to cancellation of old and re-issue of new certificates of deposits. Part of certificate No. 2537 (Exhibit 20) came from the running stock account No. 199. This certificate was outstanding until April 1916. The proceeds of this certificate were part of deposit No. 4374, dated April 1, 1916 for $20,000, part came from the running stock book No. 199. This certificate was outstanding until October 6, 1920 when it was cancelled and proceeds used, in part, in connection with the issuance on October 6, 1920 of paid up stock certificate No. 882 for $45,000, 450 shares. Part of the amount was made up from certificate No. 5421 for $5,000, cancelled October 6, 1920, and used as part payment of paid up stock certificate for $45,000. In addition $20,000 was drawn from the running stock account No. 199 to make up a total of $45,000 for which the paid up stock certificate was issued. Mrs. Taylor was not the holder of a certificate of deposit since the issuance of the certificate for 450 shares on October 6, 1920. All prior certificates of deposit were eventually drawn into that paid up stock certificate and Mrs. Taylor has never been issued a certificate of deposit since. The $45,000 certificate was cancelled April 5, 1921 and the proceeds used in part payment of paid up stock certificate No. 1003 in the amount of $50,000. A check was issued on April 5, 1921 payable to Mary Taylor in the amount of $45,000 which check bears the endorsement of Mary Taylor, check introduced as Exhibit 28. The stub of that check, No. 42982, bore notations, "April 5, 1921, Mary Taylor. No. stock 882, for Pd. stock. $45,000.00. Received payment $45,-000.00. Signed Mary Taylor." The check was re-deposited in the association and endorsed by Mr. McDonald, secretary. Dividends were paid on paid up stock certificate No. 882 at the rate of 6%. A dividend on the paid up stock in the sum of $1350 on April 1, 1921 was used in part payment for paid up stock certificate No. 1003, issued April 5th in the amount of $50,000. No other dividends were paid. Stock certificate No. 1003 was outstanding until March 29, 1932, at which time it was cancelled and used as part payment for paid up stock certificate No. 1309 in the name of Fidelis Jackson for $13,000, Doris Jones $15,000, Angie Smith $15,000 and Cleota Brown $15,-000. The $3650 was used in part payment of certificate No. 1003. Dividends were paid

on all certificates up to and including October 1st and also dividends on April 1, 1933. All dividend checks were endorsed by the fictitious parties to whom the stock was issued and by the defendant A. C. McDonald. A check payable to Mary Taylor was issued October 1, 1924 for $403 and endorsed by her. Other checks were later issued to Mary Taylor, endorsed by her and the association. Other dividend checks were introduced representing payments of dividends to the holders of the running stock in the fictitious names. Checks issued at regular dividend periods on the running stock at the rate of 6 1-5% annually. A credit slip indicating that dividends had been paid to the fictitious stockholders were credited on account No. 12524 in the name of Mary Taylor. Counsel for defendant points out that the credit slip does not indicate what it is for. The debit ticket of April 1, 1929, is marked on running stock account No. 12524 for $1798 covering dividends due the fictitious names until April 1, 1929 at the rate of 6 1-5% on stock amounting to $58,000. A check, dated October 1, 1928, payable to Mary Taylor or bearer for $1798 represents dividends on paid up stock certificates in the name of the fictitious stockholders. Other payments based on 6 1-5% dividend issued to the various stockholders covered by checks payable to the order of Mary Taylor covering dividends until April 1, 1931 at the rate of 6 1-5%.

A debit ticket for paid up stock dividends dated October 1, 1931 for $3285, signed Mary Taylor, with notation "2 R. S." On the back there are the names of the fictitious stockholders. The ticket charges the account with stock dividends and a credit ticket was issued. The amount of $3286 represents the paid up stock certificates issued to fictitious holders. The figures on the back should be the full amount of stock rather than the number of shares. The debit ticket indicates stock dividends from paid up running stock. The same condition relates to later dividends. The debit ticket dated April 1, 1933 for $3425 has the name of Mary Taylor signed thereon and represents a dividend payment on stock certificates in fictitious names and represents a dividend on the gross amount of $137,000. Ticket marked Exhibit 39.

As to subscription of stock, defendant's Exhibit 11, signed by Mary Taylor, in connection with running stock account No. 199, dated October, 1920, the card is not signed. Further examination as to stock subscriptions on running stock account No.

199 and 7190 in the name of Luella Jenkins, defendant's Exhibit 40, relates to stock account in the name of Luella Jenkins, which was later closed. Certificates of deposit issued to Allen C. McDonald were cancelled March 3, 1928. The proceeds of the checks issued to McDonald went into the account of Mary Taylor, No. 12524. Dividend check in the name of McDonald was supposed to have covered transactions of Mrs. Taylor in reference to the South Park Bank.

At a meeting of the stockholders, held October 4, 1916, Mary Taylor's 20 shares was voted by proxy to Allen C. McDonald. Other stockholders were noted as voting in person. This voting by McDonald was repeated (as proxy) in succeeding years.

In the meeting of stockholders October, 1922, no stock was voted in the name of Mary Taylor, but it appears that McDonald voted by proxy for the fictitious stockholders in a total of 80 shares.

In the meeting of 1923, McDonald voted as proxy for the fictitious names in the amount of stock held by them. The record discloses the following voting proxies of shares belonging to Mary Taylor, either in her own or fictitious names:

| | | |
|---|---|---|
| October 1, 1924 | 682 | shares |
| October 7, 1925 | 580½ | shares |
| October 6, 1926 | 641½ | shares |
| October 5, 1927 | 714 | shares |
| October 3, 1928 | 750 | shares |
| October 2, 1929 | 1080 | shares |
| October 1, 1930 | 1316 | shares |
| October 7, 1931 | 1275 | shares |

At that meeting, October 7, 1931 there were 2377 shares represented, so that the proxies of Mrs. Taylor and her associates were more than a majority.

October 5, 1932 there was a total of 1522½ shares represented, of which Mary Taylor and her associates are credited in the record with having voted 182 shares. This represented either a great change or a mistake in the record, as at recent former meetings they had voted ten times the number of shares that they voted October 5, 1932, without there being a corresponding change in their stock holdings. See Exhibit 62. Possibly it was the first time it was realized that the vote of any one stockholder was limited to 20 shares.

## FURTHER EXAMINATION AS TO OTHER EARLIER PROXIES.

They were practically all voted by Allen C. McDonald. Some proxies were blank, both as to date and as to signature. In the 1932 proxies, Mary Taylor's name appears on the first one. The others bear the name of fictitious stockholders. The 1932 meeting was the last before the company was taken over by the superintendent.

An examination was made of the stubs of stock certificates to ascertain what proportion was signed by those receiving stock. The book out of which three certificates in question were issued, Nos. 4185, 4186 and 4187, 181 certificates were issued which were not signed on the stubs of the certificate book. About 18 out of 200 were signed. In the stock book, out of which certificates 4584 and 4585 were issued in 1931, the same average of signed stubs was testified to. The debit ticket having reference to plaintiff's Exhibit 5, certificate 4585 for 150 shares of paid up stock to Mildred Cook, issued October 29, 1931, discloses the signature, "Mildred Cook or Mary Taylor." Defendant's Exhibit 75.

Another such debit ticket was signed, "Mary Taylor, by A. C. McDonald." This debit ticket was for $16,000 used to pay for paid up stock issued to Ludovia Fries.

Testimony is given as to the relative frequency of the terms "Div.", "Dv", "In" and "Int". In reference to running stock accounts the witness states that he examined 200 to 300 cards and that the proportionate use of these terms was approximately the same.

Testimony is given as to the interest paid on certificates of deposit, which shows an initial interest of 5½% in 1912 lessened somewhat in 1917; 1921 to 1927 6%; 1928, 1929, 1930 6% and an occasional 5%; 1931 6%, 5½% and 5%; 1932 5% and an occasional 6%; 1933 5%, 4% and an occasional 6%.

The dividend rate from April 1, 1921 up to and including April 1, 1931 was 6 1-5%. The difference in the dividend rate and the interest rate, for a ten year period, with some exceptions was 2-10 of one per cent. The dividend rate in 1933 was cut to 1% on paid up and running stock for six months ending March 31, 1933, not immediately payable for want of cash. That was the last dividend. After the declaration of a dividend of ½ of 1% was credited to the certificates belonging to Mary Taylor and later an additional 4½% in the full amount of $3425, the result of the transaction being that she received a credit of 2½% for six months instead of ½%, which was declared and paid to others.

On none of the checks issued, for either

dividends or interest, is there any indication as to which was being paid, except as it might arise from a computation of the amount. The earnings of Mrs. Taylor on her certificates were either credited on her pass book or added to other funds and put in new certificates. The income was payable to Mary Taylor, even though it was from the stock in the fictitious names.

The witness is of the opinion that the endorsements on checks were made by Mary Taylor, where her name appears, based upon similarity of handwriting. Other checks were endorsed by Mary Taylor, through C. D. Thomas. With some exceptions checks were signed by Mary Taylor, although some are signed by Carrie Thomas.

Being examined as to the implication to be drawn from the use of the word "Div" as against "Int", witness states that his investigation "showed me that it was absolutely a dividend credit." This because of the existence of the running stock account. Without other facts "Int" would mean interest and "Div" mean dividend. The association carried ledger cards for both running and paid up stock but no ledger cards for certificates of deposit. When the credit at the rate of 5%, on April 1932, was given on Mary Taylor's $137,000 of outstanding certificates, the interest account in the association was charged with the credit as was also the credit passed to her in October 1932 and the credit of 1½% on April 1, 1933, the association treated these credits as interest, temporarily, in 1932 and 1933.

The subscription card, defendant's Exhibit 11, dated October 6, 1920, for 100 shares of stock was signed by Mary Taylor and a subscription card for 16 shares March 29, 1922, signed by Luella Jenkins, were the only two subscriptions to stock pertaining to Mary Taylor that were found. Another card was found, but not signed. There is nothing in the records of the association to inform as to Exhibits 23c, 23d and 23e, that knowledge was brought home to Mrs. Taylor, by any subscription card, that she was subscribing for stock or whether she was to be treated as a special savings depositor. There is nothing on checks used to pay dividends or interest that would indicate which it was except through a computation to ascertain the rate which was being paid.

PLAINTIFF'S EXHIBITS.

A great number of exhibits have been introduced and it is doubtful if they will justify a detailed examination. Many of them are photostatic copies, which are in places so imperfect as to defy the reading of figures, which may possibly be of importance. However, we will address ourselves to the task as best we may.

Plaintiff's Exhibit 1 consists of 16 cards, dated from October 1, 1922 to April 1, 1925. They all have printed on them the statement "This check covers semi-annual interest—dividend due on time deposits—stock to—. Certificate numbers;—Carrie D. Thomas, 1st Ass't Secy."

Those introduced contain the names of Mary Taylor and the various fictitious stockholders, giving the correct stock certificate number for the running stock issued to the parties whose names are attached. Most of them are for $465 and some for $403. These sums are the semi-annual dividends due on the various stocks held. The cards have both the word "interest" and "dividend" nothing indicating what it is, but most of them refer to the proper number for the certificate of running stock.

Exhibit No. 2 is a pass book issued in the name of Mary Taylor, under the number 12524, but having erased number 17723. The book has no inscriptions from which we may definitely determine its purpose. It does however state, under the heading "Certificate of Deposit",

"Certificates of time deposits are issued by the association, on which a fixed rate of interest is paid, if the deposit be made for a certain or definite time, as provided in the certificate."

It is stated that the association has always paid the highest rate of interest on this class of deposits consistent with safe methods, etc. It is further stated:

"Such depositors do not become stockholders, and time certificates have appealed to those persons who desire a guaranteed rate of interest. Certificates are also issued for temporary deposits, for a short or indefinite time."

Under the heading of running stock it is stated in substance that deposits are received on "Running Stock" or book account on which any amount can be deposited at any time and bears the regular association dividend compounded twice each year, April 1st and October 1st. These book deposits, however small, bear dividends. This is a most attractive form of investment to those who may wish to deposit from time to time. This book also contains a certificate to subscribe for ... shares of running stock and a place for signature of secretary

and a place for assignment. Neither the certificate nor assignment are signed in any way. The book includes a statement of "Rules governing savings accounts". Although "Savings Accounts" are the matters under discussion, the first rule is as to running stock deposits. The second rule provides that each depositor shall at the time of making his first deposit be required to sign a stock subscription and signature card and shall be deemed thereby to signify his assent to the by-laws, etc.

Rule III relates to running stock deposits to the effect that they shall be entered not only upon the books of the association but also upon the pass book.

Rule V provides that on April and October running stock accounts shall be credited with such dividend as may have been earned during the preceding half year.

Rule VI provides that all depositors may withdraw all or any part of their deposits, credits or stock, but the association reserves the right to require notice.

It will be noted that there is no definite statement in this book as to certificates of deposit and that whatever statement is made under the heading of "Rules" is more applicable, if not exclusively so, to running stock. The book is poorly kept in that it makes it very difficult to determine the year that any deposit or withdrawal should be referred to, but by examination we arrive at the conclusion that it was issued in May, 1927, carrying an initial balance of $37,719.86. There are a great number of comparatively small deposits and at the semi-annual period in October and April of each year there is entered in red what we may presume to be credits of interest or dividends as the amounts seem to vary with the balances. The last entry is made on September 8, 1933 with a balance of $12,-818.99, the amount claimed in plaintiff's petition as having been a savings account deposit and not for the purpose of or on a running stock account.

Without going into further discussion in reference to this book, we are of the opinion that in spite of what the plaintiff may have said to anyone at the time she began to make her deposits until the institution was closed, this book distinctly and definitely represented running stock and has no element by which we can attach to it a preference. The plaintiff in her testimony has alluded to this book as being a savings deposit book and in her instructions to the officers, but she has also stated that it was used as a book for accumulating larger sums which she used for investment

in certificates of deposit. We do not mean to say that because we hold that this is a running stock book that it necessarily follows that those sum s which passed through this book and were afterwards further invested in other forms of securities were thereby definitely fixed as running stock. This book is simply the usual and convenient form followed by all associations for a running account which has not yet reached the status of a fixed investment. Under the statement "Certificate of Deposit" there is information as to time deposits upon which a fixed rate of interest is paid, if the deposit be made for a certain or definite time as provided in the certificate. This is a definite statement that the use of this book is not the correct or authorized way in which certificates of time deposit may be evidenced. Whatever may be our holding in reference to the other certificates of stock, we may now definitely conclude that this book and the sum shown in the balance will be excluded as a preferred claim.

The next group of 6 exhibits are grouped: 3 & 13; 6b & 9; 6c & 10; 6a & 11; 6 & 12; 3b & 14. They are respectively certificates of paid up stock in the Dayton Building & Savings Association as follows:

| Exhibit No. | Stock No. | Amt. Shares |
|---|---|---|
| 3-13 | 4185 | 160 |
| | Mary A. Booth, April, 1929 | |
| 6b-9 | 1306 | 150 |
| | Cleota M. Brown, March 1922 | |
| 6c-10 | 1307 | 150 |
| | Angie L. Smith, March 29-22 | |
| 6a-11 | 1308 | 150 |
| | Dorris R. Jones, March 29-22 | |
| 6-12 | 1309 | 130 |
| | Fidelis Y. Jackson, March 29-22 | |
| 3b-14 | 4186 | 160 |
| | Clara S. James, April 1, 1929 | |
| 3a-15 | 4187 | 160 |
| | Flora Staff, April 1, 1929 | |
| 4-16 | 4584 | 160 |
| | Ludovia Fries, Oct. 17, 1931 | |
| 5-17 | 4585 | 150 |
| | Mildred Cook, Oct. 29, 1931. | |

The amounts necessary to purchase these certificates of paid up stock are definitely linked with the running stock account of the plaintiff showing that all transactions were conducted out of her account. There are attached to each certificate the photostatic copy of the stub of the stock book and none of them show any signature of Mrs. Taylor or any of the parties in whose name she carried her stock. The stubs do

show the date with the number of shares and the number of the certificate and are probably in the handwriting of M⁻ss Thomas. Witness testified that all stock certificates were issued and permanently placed in the bank vault where they remained until 1932. A physical examination of the certificates just referred to indicate that this is probably not true because they bear the appearance of considerable handling and soiling, which we are not privileged to attribute to the usual careful handling of an attorney or of stenographer since they were introduced. We may be mistaken in this and the soiled condition may be due to handling since they came out of the bank vault in 1932.

Exhibit 7 is a subscription card for running stock No. 12524, with the name Mary Taylor inserted, dated October 2, 1924. It is not signed by Mary Taylor, but agrees with the date and account No. 12524 opened on the books of the company. Counsel for plaintiff urge that the fact that this card, contemporaneous with the opening of account No. 12524 is indicative of the fact that the account was not a running stock account. We do not agree that this so indicates. The loose method in which business was done, both by plaintiff and the bank leaves us without any definite inference to be drawn from the fact that the subscription card was not signed.

Exhibit 8 is of no consequence.

Exhibits 18 to 22 inclusive are certificates of deposit, all issued to Mary Taylor, dated from October 29, 1911 to April 6, 1917 bearing numbers from 792 to 5491 and being respectively in the sum of $4500, $6000, $10,-000, $20,000, and $5000. Their respective stubs to which the certificates were attached are all signed by Mary Taylor and all except the last is endorsed by Mary Taylor, all in her own handwriting as judged from her signature on her petition. They are inter-related in that some were surrendered to pay for the more recently issued certificates and ultimately surrendered for the payment of the running stock certificates.

23a and 23b are ledger sheets on the running stock ledger account No. 199 for 100 shares in the name of Mary Taylor. First balance August 31, 1920, $20,300.11 continuing until (presumably) April 1, 1922 at which time there remained a balance of $180.58. The largest withdrawal was $20,-000 on October 6, 1920, with $3650 withdrawn on April 5, 1921. The credits on the account are simply dates with the amounts deposited, except "Int." April 1, 1922, $220.58.

The exhibit shows a typical running stock ledger, with nothing to distinguish it from the ordinary ledger account for running stock except possibly the notation "Int" above noted.

23c, d, e and f are running stock ledger accounts in the name of Mary Taylor, book No. 199, the opening account being October 7, 1911 and the last entry being October 11, 1920, with a balance of $21,645.99. The original entry was for 20 shares increased to 50 and then to 100. The caption of the different columns are "Date", "Dividend", "Deposits", "Withdrawals" and "Balance". Various items are entered for dividends approximately on April 1st and October 1st of each year. The last entry of dividend being on October 1, 1920 for $545.88. The amount of dividend credited varied with the balance. The largest withdrawal on this account was $5000 on April 1, 1917. There is nothing in the account to show anything other than the standard running account ledger. During the period covered by this account, the certificates of deposit, covered by Exhibits 12 to 22 inclusive, were outstanding. Counsel for plaintiff comments upon these and asserts that along with Exhibits 21 and 22 they show the "Birth of the first illegitimate certificate issued in the name of Mary Taylor on October 6, 1920, being certificate for paid up stock for 450 shares, defendant's Exhibit 13."

Exhibit 24 is a certificate that Mary Taylor is the owner of 500 shares of the Dayton Building & Savings Association, being certificate No. 1003, dated April 5, 1921. The stub does not show any signature under the place for a receipt nor is there any other indication that Mary Taylor is the owner except her name as written in the proper space. The certificate is marked "Paid October 19, 1922". Counsel for plaintiff comments on this exhibit, as the first five certificates issued to Mary Taylor were certificates of deposit; thereafter eleven certificates of P.U.S. were wrongfully issued. Counsel states "she receipted for each of the five certificates of deposit, she did not receipt for a single one of the certificates of paid up stock."

25a is a memorandum dated 3-29-22 in the name of Mary Taylor for stock certificate No. 1003 "for paid up stock in the amount of $50,000." No receipt by Mary Taylor or anyone as representing her. Attached to Exhibit 25b, a check for $50,000 dated March 29, 1922 payable to C. D. Thomas, agent, and endorsed by C. D. Thomas, agent and by the Merchants National Bank. Mary Taylor's name does

not appear. 25c is a memorandum dated March 29, 1922 in the name of Mary Taylor for stock No. 199 for R.S. in the sum of $8000.16. Not signed by Mary Taylor. 25d is check for same amount and date, paid to C. D. Thomas, agent and endorsed by C. D. Thomas, agent and by the Merchants National Bank. There is a notation of the figures 49929 on the back of this check, significance not disclosed. Comment of counsel is that these certificates are checks and stubs evidencing the mechanics of splitting up certificates of P.U.S. for 500 shares and adding $8000.16 from book account No. 199 to provide for the issuance of plaintiff's exhibits 6a, b and c totaling $58,000. Counsel states that Mary Taylor did not sign any instrument in connection with this transaction.

Exhibit 26 is a debit charge marked R. S., account No. 12524, dated April 1, 1928. Original entry of $55,000 erased and $48,-000 substituted. Printed statement, "Received from the Dayton Building & Savings Association, Dayton, Ohio, the above amount which has been charged to my account." Signature, Mary Taylor, and below the notation in ink "3 new C. D." Counsel comments that this is a bookkeeping memorandum known as the debit ticket. Not signed by Mary Taylor. Name of Mary Taylor written by C. D. Thomas. Orders 3 new C. D.'s in total amount of $48,000 and charged to Mary Taylor's deposit account No. 12524. Carried on the books of defendant as R.S., but not so designated on her pass book. Comment further:

"This exhibit should be final proof that plaintiff understood she had C.D.'s, wanted C.D.'s and asked for three new ones, yet even on this order she was issued three certificates of P.U.S."

Exhibit 27 is a debit charge, dated 4-14-32, for $3425 signed by the name Mary Taylor and having in the upper left hand corner in ink the entry "Int". Attached is a memorandum bearing the number, 12524, dated 4-1-33 in the name of Mary Taylor showing the amount deposited $3425 with other notations showing a total of $13,118.95. In the right hand corner in writing the words R.S. Comment by counsel. Debit ticket crediting plaintiff's account with $3425 as interest for period ending April 1, 1932, during which time no dividend was paid and prior to which the plaintiff "raised a fuss": Wholly in the handwriting of Carrie Thomas. We call attention to the fact that the debit charge is dated 4-14-32 and the attached

memorandum showing the same amount deposited is dated 4-1-33.

Exhibit 28 is a debit charge, dated October 5, 1932 for $3751.00 signed Mary Taylor, marked R.S. No. 12524. It is marked in the upper right hand corner in ink "Int". Attached memorandum same amount in name of Mary Taylor, marked R.S., account 12524 and certain other figures, significance not known. Comment by counsel as to Exhibit 28. Debit ticket in handwriting of Carrie Thomas. Credits Mary Taylor on books with $3751.09 as interest on her deposit, ending October 1, 1932. Same amount credited on Mary Taylor's pass book. During this time no dividends paid. Counsel points out that on April 1, 1933, plaintiff's account was credited with $3524 as interest and on the pass book there was credited the sum of $3661.42. Counsel further comments that although plaintiff's pass book was presented at the office of the defendant twelve times from April 1, 1933 to September 8, 1933, the defendant never questioned the correctness thereof, the attempt to charge off the amounts credited as interest, and this in spite of the discussion by the Board of Directors July 14. Record 165.

**Our general comments on plaintiff's exhibits.**

Without going into further detail as to these exhibits, they seem to show that up until October, 1920, the plaintiff had a general running ledger account, but that at various intervals, amounts were charged from this to what were clearly certificates of deposit, these being signed and endorsed by the plaintiff. After 1920 use of same account No. 199 was continued until changed to No. 12524 as running stock ledger account. From that date on paid up stock was issued in the various amounts charged over the period of years, some to Mary Taylor and some to her fictitious associates. Paid up stock certificates bore no signature of Mary Taylor. We comment upon the fact that after Mary Taylor had "raised a fuss" in 1932 her account still continued as a running stock account and her certificates still continued as paid up stock certificates. According to her testimony, these certificates were in the vault at the bank. After she complained that no dividends were paid, credits were given to her account for interest at 2½% semi-annually, even though stock dividends were not then being paid. It occurs to us that had the association then conceded her correct account was for certificates of deposit that they would have retired the P.U.S. stock and issued certificates of deposit for the amounts involved,

instead of simply entering on her account what they designated as "Int". It also occurs that had Mary Taylor been concerned as to how her credits stood she would have then demanded the cancellation of the P.U. S. and the issuance to her of the paid up stock, such as she had prior to 1920. We may comment further on this.

### DEFENDANT'S EXHIBITS.

Exhibits 1 to 10 are standard forms of proxy issued to A. C. McDonald to vote the stock in the Dayton Building & Loan Association for the election of directors thereof at the annual meeting to be held at the general offices of the association on designated days, in 1932 and 1933. These are all signed in the handwriting of Mary Taylor as ascertained from her signature of her petition and affidavit. Under her name appears the various fictitious names in which the several stock certificates were issued. Mary Taylor in her examination admits the signatures and gives explanation which will be commented on later.

Exhibit 11 is a subscription for stock dated October 6, 1920, stating that the undersigned subscribes for 100 shares of the capital stock of the Building & Savings Association, signed by Mary Taylor in her own handwriting.

Exhibit 12 is the same form of subscription for 16 shares, dated March 29, 1922 and signed by Luella Jenkins (apparently in handwriting of Mary Taylor) in whose name, under that date, running stock account No. 7190 for 16 shares was issued with the first balance under date of March 31, 1922 for $1550. The last entry on this account was October, 1924, showing a withdrawal on October 2nd of $10553.39, balancing the account, but indicating that it was transferred to account No. 12524, which is the final account in the name of Mary Taylor. This exhibit has attached to it Exhibit 4 as the ledger account.

Defendant's Exhibit 13 is a stock certificate for 450 shares issued to Mary Taylor on October 6, 1920 certifying that Mary Taylor is the owner of 450 shares of $100 each of the capital stock of the Dayton Building & Savings Association. On the reverse side of the certificate is an assignment, undated, but unquestionably signed by Mary Taylor in her own handwriting.

Exhibits 14 and 16 are attached to each other. Exhibit 14 is a memorandum, dated October 6, 1920 in the name of Mary Taylor for stock certificates No. 4374 and 5421 with the notation "received payment $25,-000." Signed by Mary Taylor. Check issued on same date was to Mary Taylor and endorsed by Mary Taylor, both signatures being her genuine signatures as compared to the signatures on her petition and affidavit.

Exhibit 15 has attached thereto Exhibit 17. It is numbered 40135, dated October 6, 1920 in the name of Mary Taylor. On the line is designated number of stock, No. 199 for R.S. and below is the receipt for $20,000 signed by Mary Taylor. Exhibit 17 is a check made payable to Mary Taylor for $20,000 endorsed by Mary Taylor, both in her own handwriting.

Exhibit 18 consists of eight proxies, the first unquestionably signed by Mary Taylor, the others signed by the fictitious persons in handwriting, some of which corresponds closely to the signature of same persons as shown in Exhibits 1 to 10. These proxies bear no date and are in blank.

Exhibit 19 is a proxy dated October 2, 1928 to A. C. McDonald, signed by Mary Taylor in person. This seems to predate the other proxies, but could be based on her running stock account then existing.

Exhibits 20, 20a, 20b, 20c and 20d are undated proxies with no designation of name, signed by the fictitious persons, apparently in the handwriting of Mary Taylor. The revenue stamps are cancelled on October 3, 1932 with rubber stamp.

Exhibit 21, dated October 1, 1922, is a proxy signed by Dorris R. Jones, in the handwriting apparently that of Mary Taylor.

Exhibit 22 is a proxy dated October 1, 1922 to A. C. McDonald signed Luella Jenkins by Mary Taylor. The signature Luella Jenkins does not resemble Mary Taylor's but the signature Mary Taylor is unquestionably that of Mary Taylor.

Exhibits 23-1 to 23-36 are checks for various amounts, mostly for $403 or $465 with some issued in other amounts, notably No. 2327 for $1550; No. 2328 for $1798; Nos. 2330, 2332, 2333 for $496; Nos. 2334, 2335, 2336 for $3286. The checks were issued mostly on April and October 1st, beginning at October 1, 1922 and extending to April, 1931. These were usual dividend dates, but may equally have been dates for credit of interest. Fifteen at least were issued to Mary Taylor and endorsed by Mary Taylor in her own handwriting. The rest were issued to the fictitious stockholders, endorsed by them in the handwriting of Mary Taylor as near as we may judge from her genuine signature. The larger checks, to-wit, for $3286 were payable to Mary Taylor and signed

by her. Many of the checks have on their back in handwriting figures, the significance of which is not revealed.

Exhibit 24 is a running stock debit account dated April 12, 1930 for $200 No. 12524, receipt signed by Mary Taylor in her own handwriting.

Exhibit 25 is a similar memorandum for $254.51, running stock account No. 12524 signed by Mary Taylor in her own handwriting.

Exhibit 26 is a check dated March 26, 1930 for $300 issued to Mary Taylor and charged to account R.S. 12524, endorsed by Mary Taylor. Stub is receipted by Mary Taylor. Signature is hers.

Exhibit 27 is a check for $1000 issued to Mary Taylor endorsed by Mary Taylor in her own handwriting. No corresponding stub.

Exhibit 28 is a check for $45,000 payable to Mary Taylor, dated April 5, 1921, endorsed by Mary Taylor. The stub shows number of stock, 882, for "Pd. Stock". Stub receipt signed by Mary Taylor in her own handwriting.

Exhibit 29 is an original stub in the name of Mary Taylor for P. S. for $1350.

Exhibit 30 is a check for $403 dated October 1, 1933, endorsed Mary Taylor, C. D. Thomas, R. S. 12524.

Exhibits 31 to 33 inclusive are checks issued to Mary Taylor each for $465 endorsed Mary Taylor, C. D. Thomas, R. S. 12524.

Exhibit 34 is a check to one of the brain children for same amount, not endorsed.

Exhibit 35 is a memorandum account designated "R. S., No. 12524" dated April 1, 1927 in the sum of $1798 in the name of Smith, Jones, Brown and Jackson.

Exhibit 36 is a dividend debit dated April, 1929 for $1798 received, signed "On R. S. 12524".

Exhibit 37 is a check to Mary Taylor or bearer for $1798 paid October 1, 1928, notation on back "On R. S. 12524".

Exhibit 38 is a debit charge for $3286, dated October 1, 1931, for paid up stock certificate signed by Mary Taylor, appearing to be genuine signature, notation below "To R.S." On the back thereof are the names of the fictitious persons with the total of $1060 and a calculation showing a credit at the rate of 6 1-5%, amounting to $6360, plus $212 and divided by 2, $3286, indicating a semi-annual dividend at the rate of 6 1-5% for the stock enumerated.

Exhibit 39 is a debit account dated April 1, 1933, marked "dividend" for $3425. Figures indicate the computation at the rate of 2 2-10%, although this is not clear as the photostatic copy is not satisfactory. Receipt signed by Mary Taylor apparently in the handwriting of Carrie Thomas.

Exhibit 40 not on file.

Exhibits 41a to 41g, inclusive, are running stock ledger accounts in the name of Mary Taylor's account No. 12524. Number of shares not designated, beginning with a balance of $12426.94 on October 22, 1924 and continuing as an active account with a balance on September 3, 1933 of $12,818.99, corresponding to the claim in the plaintiff's petition with withdrawal on September 23, 1933 of $12,155.54, leaving a balance of $703.45 in account No. 12524. Apparently from this account, she got $12,155.54 of the amount now claimed to be due on her pass book.

Exhibits 42 and 43 are not in chronological order with the exhibits just set out Exhibit 42, dated September 20, 1928, is a certificate in the name of A. C. McDonald for $5000 at 6% interest. Exhibit 43 is a certificate dated September 20, 1928 in the name of A. C. McDonald for $3000. The significance of these certificates is disclosed in the testimony, but not of importance.

Exhibit 44 is a check to the order of A. C. McDonald for $8013.40, endorsed by A. C. McDonald and cleared through the clearing house and has reference to an interoffice transaction.

Exhibit 45 shows the disposition of this amount as a credit to Mary Taylor on account No. 12524 R. S.

Exhibit 46 not found.

Exhibit 47 is a photostatic copy of the minutes of the stockholders meeting for 1916 showing a registration in the name of Mary Taylor of 20 shares of stock out of a total of 268 represented.

Exhibits 48 to 62 inclusive, are photostatic copies of stockholders' meetings, the first being in 1918 and the last October 5, 1932 at which latter date 1522¼ shares were represented. Mary Taylor appears by proxy in the name of A. C. McDonald for 58 shares and her flock of brain children with 15 and 16 shares each. In the meeting of October 1, 1930, the total number of shares was 2964 of which McDonald held and voted proxies for fictitious holders in the amounts varying from 130 to 160 shares and for Mary Taylor 266½ shares. It will be noted that there is a very great difference between the number of shares voted on October 1930 and 1931 and on October 1932. This we must attribute to the fact that after the voting of the heavier number of stocks in the former years, as appear by the photostatic

copies, there was discovery in 1932 that the by-laws limited the voting to 20 shares of stock for any one stockholder. There is no corresponding diminution in the shares of stock actually held.

Exhibits 63 to 74, inclusive, are proxies issued in blank. Exhibits 63 and 64 are issued in blank by the fictitious stockholders. The rest are issued by Mary Taylor and by Mary Taylor followed by the name of the fictitious stockholders. The signatures of Mary Taylor are genuine so far as we can see. These are the ordinary proxies authorizing proxy "in my name, place and stead case and vote, etc., for the election of directors at the stockholder's meeting."

Exhibit 75 is a debit charge to account No. 12524 for $15,000 dated October 29, 1931 "To Pd. Up Stock". Receipt signed Mildred Cook or Mary Taylor, apparently in the handwriting of Mary Taylor.

Exhibit 76 is for a debit charge of $16,000 dated October 1, 1931 against account No. 12524 "For Paid Up Stock" signed Mary Taylor by A. C. McDonald, endorsement on back "Paid up stock certificate for $16,000 for Ludovia Fries."

## CONCLUSION.

After a diligent examination of the record of this case together with the exhibits, we cannot escape the conclusion that so far as the association was concerned, there was a long continued custom of carrying all the accounts of Mary Taylor, since 1922 as either running stock accounts as exhibited by the books, or paid up stock certificates, as exhibited by the certificates issued in the name of Mary Taylor and various of her fictitious stockholders. We might even conclude from the record that during the time prior to 1922 when there was unquestionably certain paid up or certificates of deposit issued, that the association carried the account of Mary Taylor for her current deposits as running stock and not as certificates of deposit or deposit accounts.

Mary Taylor has been consistent in stating that on all her transactions with the bank she had insisted that she should have certificates of deposit and in this she is corroborated, in a rather weak way, by Carrie Thomas who fortifies her in the statement that over the period of ten years the paid up stock certificates or the running stock account was not revealed to Mary Taylor. It is regrettable that neither counsel felt at liberty to call A. C. McDonald, as we understand he is available. As secretary and factotum in the management of the bank, he certainly would have been able to give more definite, satisfactory information than we have had. It is, of course, possible that both parties were afraid to produce him.

We unhesitatingly conclude that, as far as the ordinary interoffice transaction in reference to these accounts, that it was at all times, since 1922, running stock accounts or a paid up stock account and that there was no intimation that the association regarded it as a deposit account. Even when the directors discussed the matter on July 14, 1932, no one seems to have suggested that, if this stock account was as a matter of fact a certificate of deposit account, that the books of the company should so show. In lieu of this, there resulted the very transparent and ineffective procedure, of crediting these accounts with 2½% semi-annually as interest after the dividends had ceased as heretofore stated, if there had been an honest mistake to be honestly corrected, the paid up stock certificate should have been recalled and regular C. D. certificates issued in their stead.

We could readily determine that all transactions since 1922 related to running or paid up stock were it not for the insistence of Mary Taylor that she did not ask for and did not want running or paid up stock, but did want certificates of deposit. In the face of this declaration upon her part, we must examine more minutely those things that had been unquestionably called to her attention and examine more minutely the testimony of Carrie Thomas. The first thing that confronts us is the persistence of Mary Taylor during a considerable period in signing proxies appointing A. C. McDonald as her proxy to vote her stock. While some of these proxies were in blank and undated, yet a great number of them were signed by Mary Taylor in her own handwriting. This she admitted on examination, but gives it as her excuse that McDonald said that he wanted the proxies in order to protect his position in the bank by the control of the election of the directors. Mary Taylor not only signed her own name, but when occasion required, she signed the names that she and Miss Thomas had invented.

The next thing that occurs to us is the difficulty of explaining the fact that Mary Taylor, on numerous occasions, signed checks that were issued in the payment of dividends and checks that were used in the issue of the various shares of paid up stock as shown by the exhibits.

It will be impossible for us to detail the instruments signed by Mary Taylor, but we might make brief reference to pages 36 and 38 of the record for the selection of

the fictitious names. As to her signature for subscription of stock she stated:

"I never meant to subscribe for stock. Well, if I signed it I guess I did."

When asked the circumstances under which she signed the instrument she stated:
"With the intentions of having certificates of deposit, sure."

On page 44 she admits the signature in the name of Luella Jenkins, and upon being asked whether she recalled any of the circumstances attending the signature she stated:
"Well, I don't know. I know that—what is this for? Signing for stock? I see 'Subscription for stock' here.
Q. Yes.
A. Well, I don't remember at all. That is my signature though.
Q. Do you recall any of the circumstances attending that transaction? (Referring to deposit of $58,000).
A. Well, that was certificates of deposit, and I think Miss Thomas—
Q. Now do you recall any request that you made at that time as to the manner in which these accounts should be entered?
·A. Always as certificates of deposit, if that is what you mean."

Speaking of the issuing of stock in the several names the question was asked, record page 45:
"Q. That the transaction involved $58,000 and that between you you selected the names of the persons in whose names the accounts were put?
A. Yes, that is true.
Q. And you recall nothing else in connection with the circumstances?
A. No, I don't."

These interrogatories were addressed to defendant's Exhibit 12 and other relating exhibits.

Exhibit 11 is subscription for stock signed by Mary Taylor. Exhibit 12 is subscription signed by Luella Jenkins, admitted to be signed by Mary Taylor. Exhibit 13 is certificate for 450 shares, issued to Mary Taylor, signed on reverse side by Mary Taylor. Other exhibits, enumerated above, show Mary Taylor's signature in numerous places, but we must always keep in mind her continued assertion that she was subscribing for certificates of deposit. She testifies:

"Time and again I have asked him (McDonald) whether he transferred that on the books of the association and he said, 'Yes, I have all certificates of deposit' and in truth and in fact he had done so."

He did not and only made the credit allowed for interest in lieu of dividends.

In reference to signing of the proxies, admissions of Mary Taylor may be found on pages 58 and 59 as well as other parts of the record. In reference to the proxies she inquired "What are they?" She stated that she never attended stockholder's meetings because she never had no stock and she was never asked to go to any stockholder's meeting.

"Q. Were you ever asked to sign an instrument which would permit Mr. McDonald to speak for you at the association?
A. No, I never did. Well, he was there about twice. He would come down to the house and he had them proxies and I signed them because—to keep his job. He always said it was to keep his job, and he said he would treat me all right in the association if I would accommodate him that way, and I did."

These occasions were twice at her house and other times he mailed the proxies. In each case when he presented them, she signed them.

"Q. And so far as you recall there was no time when he asked you to do that that you refrained from doing it?
A. No, I always did it."

The testimony of Carrie D. Thomas, the assistant secretary, pages 170, et seq of the record, is of importance in reference to the claim now asserted that Mary Taylor was not a stockholder but a holder of certificates of deposit. She became connected with the association in 1915, afterwards being assistant secretary.

On being asked over what period of time she had known Mrs. Taylor in connection with her work at the association she answered, since she had been employed there.

"Q. Do you know what the nature of her investments in the Dayton Association were at the time you went to work at the Dayton?
A. Certificates of time deposit.
Q. Do you recall whether or not you ever issued to Mrs. Taylor certificates of deposit, as such?

A. I don't recall whether I issued them or not, Mr. Brumbaugh, but I know she had certificates of time deposit, but I can't recall whether I issued them or not. I perhaps did, if I waited on her."

(She did have such certificates prior to 1920)
She stated that she recalled very few times when Mrs. Taylor was in the office.

"Q. Do you remember whether or not in these conversations you talked to her about the nature of those investments?
A. Well, mostly certificates of time deposit as far as I can recall. I can't remember."

She testified that she conducted the transaction on October 6, in reference to $20,000 certificate of deposit, being about the time that the dividend rate was raised to 6 1-5%. Being asked as to her recollection as to why the credits on the certificates of deposit and pass book then for the first time appeared as being invested in paid up stock she answered:

"A. Well, I don't believe for any other reason than that stock dividend was just a little higher than certificate interest rate and I think we always endeavored to do as much as we could for Mrs. Taylor. It just may have been that I just understood that we were to give her the highest rate, and I just wrote the certificates of paid up stock because that was the highest rate."

She admits her answer was based on speculation, stating, "I couldn't remember that." Upon being asked whether she informed Mrs. Taylor of the change from a depositor to a member, she stated,

"No, I don't believe I told her. I am very sure I didn't."

### FINAL CONCLUSION.

We think this record conclusively shows that whatever may have been the status of Mary Taylor prior to 1920, that she thereafter became, whether tempted by the higher rate of income or not, a stockholder in the institution and that she continued to be such until the final taking over by the superintendent. Many of her statements in her direct examination are contradicted by the exhibits. She frequently signed stock subscriptions and all documents necessary to the issue and cancellation of such

stock and frequently signed proxies whenever requested by McDonald.

Whether she knew of the change immediately upon its being made, it is quite apparent that during the period after it was made, she was advised or should have been advised of her status as a stockholder. She made no protest and no investigation, simply received the dividend checks, split up her stock to her fictitious holders and even when she "made a fuss" because of the failure of the payment of dividends she was apparently satisfied by a credit of 2½% semi-annual interest in lieu of the passed dividends.

Were the transactions here involved solely between the association and Mary Taylor, it might be proper to restore the relation which she says existed and should have continued to exist. But we are not dealing with the association but with other creditors and interested stockholders. If we give to Mary Taylor a preferred account of practically $150,000 to that extent the resources of the association will be depleted so far as other creditors and stockholders are concerned. We believe that she has elected as to her final standing and she must abide by the result.

In other cases we have permitted the restoration of the status of a certificate holder, but never in any case where the evidence approaches in conclusiveness that the status was that of a stockholder and not a holder of certificates of deposit.

We regret that it has been necessary for us to be long and tedious but we have recognized the importance of the case at all parties and have given it our serious attention.

Judgment accordingly.

BARNES, PJ, and HORNBECK, J, concur.